IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

FRANCIENNA GRANT,

              Plaintiff,

    v.

REVERA INC./REVERA HEALTH
SYSTEMS, et al.,

           Defendants.

HONORABLE JEROME B. SIMANDLE

Civil Action
No. 12-5857 (JBS/KMW)

**OPINION**

APPEARANCES:

Francienna Grant, Pro Se
4 Ella Avenue
Cape May Court House, N.J. 08210

Lori Anne Jablczynski, Esq.
Timothy D. Speedy, Esq.
JACKSON LEWIS, P.C.
220 Headquarters Plaza
East Tower, 7th Floor
Morristown, N.J. 07960
    Attorney for Defendants

**SIMANDLE, Chief Judge:**

<u>Contents</u>

| | | |
|---|---|---|
| I. | INTRODUCTION | 2 |
| II. | BACKGROUND | 5 |
| | A.  Rule 56.1 Statements | 5 |
| | B.  Factual Background | 7 |
| | C.  Procedural History | 17 |
| | D.  Parties' Arguments | 17 |
| |   1.  Defendants' Motion for Summary Judgment | 17 |
| |   2.  Plaintiff's Motion for Summary Judgment | 21 |
| III. | STANDARD OF REVIEW | 23 |
| IV. | DISCUSSION | 24 |

A.   Plaintiff Failed to Exhaust Her Religious Accommodation Claims                                                    24

B.   Plaintiff cannot establish a prima facie case for breach of contract                                                     27

C.   Plaintiff cannot establish a prima facie case of fraud    30

D.   Plaintiff cannot establish a prima facie case of discrimination under the ADA                                   32

   1.   No reasonable jury could conclude that Defendants failed to accommodate Plaintiff's disability           33

   2.   No reasonable jury could conclude that Defendants unlawfully terminated Plaintiff                          37

   3.   No reasonable jury could conclude that Defendants' subjected Plaintiff to a hostile work environment and/or disability-based harassment                              42

   4.   Plaintiff's ADA retaliation claim lacks any protected activity                                                      44

V.   CONCLUSION                                                  46

## I.   INTRODUCTION

In this employment litigation, pro se Plaintiff, Francienna Grant (hereinafter, "Plaintiff"), generally alleges that her former employer, Defendants Revera Inc./Revera Health Systems,[1] Premier Therapy Services, and Priscilla Miller (hereinafter, "Defendants") engaged in an array of discriminatory and retaliatory conduct as a result of Plaintiff's "work-related"

---

[1] Plaintiff appears to have incorrectly identified, in part, the corporate entity responsible for Plaintiff's employment. (See generally Compl.) Specifically, rather than name the entity that employed the individuals involved in the decision to terminate Plaintiff's employment with Premier Therapy Services (here, Revera Health Systems Management LLC), Plaintiff named corporate parents (Revera Inc. and Revera Health Systems) without involvement in the facts involved in this litigation. (Rossetti Cert. at ¶¶ 5-6.) Plaintiff's failure to identify the proper Defendant, however, does not alter the Court's resolution of the pending motions.

injury.  (See generally Compl. [Docket Item 1], ¶¶ 4-41.)
Plaintiff's Complaint specifically alleges that Defendants: (1)
failed to accommodate her disability; (2) failed to accommodate
her religion; (3) failed to intervene in the face of workplace
harassment; (4) subjected Plaintiff to unequal terms and
conditions of employment; (5) wrongfully terminated and
retaliated against Plaintiff in violation of the Americans with
Disabilities Act, 42 U.S.C. §§ 12112-12117; (6) breached
Plaintiff's employment contract; and (7) committed fraud by
terminating Plaintiff under "false allegations."[2]  (See generally
id.)

Defendants deny that Plaintiff's injury and/or her request
for accommodation motivated their employment decisions with
respect to Plaintiff. (Defs.' Answer [Docket Item 10].)  Rather,
Defendants assert that an array of workplace misconduct, namely,
insubordination, falsification of Plaintiff's time-records, and
noncompliance with medical protocol, prompted Plaintiff's

---

[2] Given the substantive nature of Plaintiff's allegations
concerning Defendants' alleged application of "[u]nequal terms
and conditions of employment," the Court finds that such
assertion constitutes an additional theory of relief in
connection with Plaintiff's ADA discrimination claim, rather
than an independent claim.  (See Compl. [Docket Item 1], 3.)
Indeed, the addendum to Plaintiff's standard, form Complaint
reflects that the alleged unequal terms of employment form the
predicate, in part, for Plaintiff's ADA accommodation claim.
(See Compl. at 2-7; Grant Dep. at 258:24-259:18.)  The Court
will construe such allegations accordingly.

termination after less than eight (8) months of employment.[3] (Id.)

Discovery is completed in this two-year old case.  The parties now cross-move for summary judgment.  [Docket Items 78 & 79.]  In their motion, Defendants assert that no evidence proffered by Plaintiff reflects any discriminatory motive, and therefore contend that no genuine issue of material fact precludes summary disposition of Plaintiff's ADA claim.  (Defs.' Br. [Docket Item 79].)   Defendants assert that Plaintiff's remaining claims similarly require dismissal principally on the grounds that Plaintiff failed to first exhaust administrative remedies, that Plaintiff's allegations fail to state a claim for relief, and due to the expiration of the applicable limitations periods.  (Id.)  Plaintiff, by contrast, asserts that the undisputed evidence instead demonstrates Plaintiff's entitlement to judgment on her ADA claim.  (Pl.'s Br. [Docket Item 78].)  In addition, Plaintiff asserts that Defendants destroyed documents concerning the purported grounds for Plaintiff's termination,

_____

[3] Defendants also assert a counterclaim for breach of contract, alleging that Plaintiff received a $2,500 sign-on bonus conditioned upon Plaintiff's completion of two years.  (Defs.' Answer.)  Defendants, however, have not moved for summary judgment on their counterclaim for breach of contract. Consequently, though the Court will dismiss Plaintiff's Complaint and close this case for the reasons stated below, such closure will be without prejudice to reinstatement in the event Defendants wish to pursue their counterclaim for breach of claim.

and therefore seeks, pursuant to Federal Rule of Civil Procedure 37(b)(2)(A), the "dismissal of all claims" related to such documents.  (Id.)

The primary issue before the Court is whether genuine issues of disputed fact concerning the basis for Plaintiff's termination preclude the summary disposition of this action in Defendants' favor.  For the reasons that follow, the Court will grant Defendants' motion for summary judgment, and will deny Plaintiff's motion for summary judgment in its entirety.[4]

## II.  BACKGROUND

### A.  Rule 56.1 Statements

Defendants filed a proper statement of material facts not in dispute, as required by Local Civil Rule 56.1(a).  Plaintiff failed to furnish a counterstatement of material facts in connection with Defendants' motion for summary judgment.  Nor did Plaintiff file a statement of material facts in support of her own motion for summary judgment.[5]  Rather, Plaintiff filed an untimely nine (9) page supplemental submission setting forth erratic citations to various deposition transcripts, in addition to her numbered "response" to Defendants' statement of material

---

[4] The Court exercises subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and exercises supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

[5] Defendants, by contrast, filed both a statement and counterstatement of material facts in accordance with Local Civil Rule 56.1(a).  [Docket Items 79-2, 90.]

facts.  (Pl.'s Supp. Br. [Docket Item 86].)  Plaintiff's
"response," however, substantially fails to respond to
Defendants' statement and to provide detailed citations to
affidavits and/or other documents in order to substantiate the
statement's factual basis.  (Id.)  Rather, the "response" either
denies, without support, various portions of Defendants'
statement (see id at 8 ("false" and "Defendant is making false
assumptions"), or nebulously refers to large swatches of
partially mischaracterized deposition testimony.  (Id.; see also
Defs.' Reply to Pl.'s SMF [Docket Item 90], 1-8 (disputing
Plaintiff's incomplete, inaccurate, and/or misleading
recitations of record in this litigation).)

        In addition, much of Plaintiff's "response" concerns the
legal relevancy of such facts, the inclusion of which the Court
finds inappropriate in connection with a Rule 56.1 statement.
(See, e.g., id. at 7 ("This suggesting retaliation").)  See also
L. CIV. R. 56.1(a) ("Each statement of material facts shall be a
separate document (not part of a brief) and shall not contain
legal argument or conclusions of law.").  Where, as in this
case, a party fails to respond to the movant's statement of
undisputed material facts with a point-by-point indication
whether the stated fact is undisputed or, if disputed, with a
precise citation to the factual record where contrary evidence
exists, then the Court assumes that the opponent has no evidence

raising a genuine dispute with the movant's stated fact. Consequently, Plaintiff's submission will be disregarded to the extent it states legal arguments or conclusions of law, and to the extent Plaintiff failed to make clear any dispute with respect to the material facts set forth in Defendants' statement.  Rather, any such fact will be deemed undisputed for purposes of the pending motions. <u>See</u> L. CIV. R. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion.").

**B. Factual Background**

By letter dated July 7, 2008, Defendant Premier Therapy Services (hereinafter, "Premier") extended Plaintiff an offer of employment as a full-time physical therapist, subject to the terms and conditions of Premier's Colleague Handbook. (Speedy Cert., Ex. 5.)  The Colleague Handbook, attached to Plaintiff's initial offer letter, advised Plaintiff of the policies applicable to her employment, including Premier's "Standards of Conduct" for all employees, Premier's disability accommodation policy, and its requirements for timely and accurate submission of payroll records. (<u>Id.</u> at Ex. 8 at 2-4.)

On July 14, 2008, Plaintiff accepted the position of physical therapist at Premier's Linwood Care Center. (Speedy Cert., Ex. 5.)  In connection with such acceptance, Plaintiff acknowledged Defendants' policy of at-will employment, and her

7

concomitant understanding that such employment could be terminated "at any time" with or without cause. (Id. at Ex. 9.) Plaintiff further confirmed her receipt and understanding of the employment policies set forth in the Colleague Handbook, but recognized that the Colleague Handbook constituted "neither a contract of employment nor a legal document."[6] (Id. at Ex. 9.) Plaintiff's work as a physical therapist commenced shortly thereafter. Plaintiff's performance evaluation for her introductory period, or first 90 days of employment, however, reflected an overall rating of "2" or "Partially Meets Requirements[,]" noting that Plaintiff "often question[ed] directives[,]" caused "some frustration" to her peers, and maintained a productivity level 58% below standard. (Speedy Cert., Ex. 19 at 3, 5.)

During a "patient transfer" on November 24, 2008,[7] Plaintiff purportedly suffered an injury to her right shoulder, neck, and

---

[6] As stated above, Plaintiff also accepted a sign-on bonus in the amount of $2,400, conditioned upon Plaintiff's continued employment with Defendants for a period in excess of two (2) years. (Id. at Ex. 7.) In the event that Plaintiff's employment terminated for any reason prior to such period, however, she agreed to repay the entire bonus "in one lump sum." (Id.)

[7] The parties' numerous submissions fail in part to set forth a clear chronological depiction of the events giving rise to this litigation. [Docket Items 78, 79, 85, 86, 88, 90, & 91.] Rather, the submissions contain, inexplicably (and occasionally in the same document), numerous discrepancies concerning the dates on which various events occurred. For the purposes of the pending motions, and based upon the Court's review of the

mid-back.  (Compl. at 2; Speedy Cert., Ex. 15.)  On December 1, 2008, Plaintiff reported her alleged injury to Defendant Priscilla Miller (hereinafter, "Ms. Miller"), the Rehabilitation Director of Premier's Linwood facility, and completed an employee workers' compensation incident report.  (Grant Dep. at 221:3-1; Speedy Cert., Ex. 15.)  In accordance with Premier's policy, Ms. Miller then forwarded the report to the Human Resources Department, and arranged for Plaintiff to receive a workers' compensation medical examination from Employee Health. (Grant Dep. at 195:21-24.)

At her initial workers' compensation assessment on December 3, 2008, Dr. Stephen A. Nurkiewicz diagnosed Plaintiff with a "shoulder sprain[,]" but determined Plaintiff "able to work" subject to certain modifications.  (Speedy Cert., Ex. 16.)  Dr. Nurkiewicz specifically directed that Plaintiff lift no more than 15 pounds and limit the use of her right arm.  (Id.) Despite Dr. Nurkiewicz's determination, Plaintiff declined to return to Defendants' facility.  (Grant Dep. at 145:15-20, 200:20-24.)  Nor did Plaintiff immediately report the status of her condition, or any follow-up appointments, to Premier. (McConnell Dep. at 53:17-23.)  Rather, Plaintiff continued to

---

parties' numerous exhibits, the Court adopts the dates set forth herein.

seek medical treatment, and "just didn't come to work[.]"
(McConnell Dep. at 53:22-23; Pl.'s Br. at 2.)

Dr. Nurkiewicz conducted a follow-up examination on
December 10, 2008. (Pl.'s Br., Ex. 2 at 3.)  Though Plaintiff
reported pain of 8 on a 1-10 scale, Dr. Nurkiewicz observed a
"partial improvement" in Plaintiff's swelling and rotation, and
found Plaintiff able to work on "Limited Duty" and with physical
therapy. (Id.)  On December 17, 2008, Dr. Nurkiewicz performed a
final workers' compensation medical evaluation, at which time
Plaintiff reported pain of 1 on a 1-10 scale.  (Pl.'s Br., Ex. 2
at 1.)  Dr. Nurkiewicz, however, found that Plaintiff's symptoms
demonstrated "no improvement" and he, accordingly, directed that
Plaintiff be referred to an orthopaedic specialist for any
additional evaluations and/or treatment. (Id.)  At Plaintiff's
orthopaedic assessment, however, Dr. John R. McCloskey cleared
Plaintiff for "modified duty," with "no patient lifting."  (Id.
at Ex. 18.)

In light of Dr. McCloskey's determination, Ms. Miller, then
informed of Plaintiff's diagnosis, directed Plaintiff to
immediately return to work on December 23, 2013 under "light-
duty" (Grant Dep. at 209:19-211:6), and with an accommodated
schedule. (Miler Dep. at 64:3-22; Grant Dep. at 143:12-15.)
Despite the physicians' undisputed indication that Plaintiff
need only limit the use of her right arm, however, Plaintiff

10

took the position that she could "hardly" perform any tasks.
(Grant Dep. at 142:18-143:4.)  Rather, Plaintiff declined, on
her own volition, to perform any tasks that required the use of
her right arm, opting instead to place her right arm in a sling
or to leave her right hand in her pocket.  (Id. at 142:18-144:8,
230:25-231:17.)

Despite Plaintiff's position, Premier attempted, on
multiple occasions, to accommodate Plaintiff in accordance with
her doctors' expressly delineated medical limitations. (Defs.'
SMF at ¶ 48.) Indeed, Premier proposed that Plaintiff conduct
assisted therapy evaluations in order to avoid any physical
lifting and/or conduct supervisory visits that require only the
completion of certain documentation. (Willey Dep. at 217:24-
219:14.)  Moreover, in light of the discrepancy between the
medical evaluations and her own professed limitations, Ms.
Miller sought additional documentation from Plaintiff, in
addition to observing, firsthand, Plaintiff's limitations.
(Grant Dep. at. 256:1-258:23.)  Despite these documented
efforts, however, Plaintiff deemed her arm functionally
inoperable, and largely refused to perform any work, modified or
otherwise.  (Willey Dep. at 217:14-16; Grant Dep. at 142:18-
144:8; McConnell Dep. at 88:2-8.)

Indeed, Plaintiff conducted only one evaluation from the
time she returned to Defendants' facility to her suspension on

11

January 16, 2014.  (Grant Dep. at 144:20-145:2.) Rather,
Plaintiff filled portions of her workday with personal physical
therapy appointments, coded as "Administration" time in her
"CareTrack" hand-held time-keeping device.[8]  (Defs.' SMF at ¶ 69;
Grant Dep. at 167:9-171:12.)  Specifically, Plaintiff logged the
following hours as "worked/administrative time: December 30,
2008, 96 minutes; January 2, 2009, 90 minutes; January 5, 2009,
95 minutes; January 7, 2009, 104 minutes; [and] January 9, 2009,
89 minutes."  (Defs.' SMF at ¶ 70.)

---

[8] During Plaintiff's employment, all physical therapists used
hand-held electronic "CareTrack" devices to capture therapy time
at the point of service, and to provide accurate and timely
information concerning the services provided to patients.
(Defs.' SMF at ¶ 25.)  The "CareTrack" devices, accordingly,
contained a set of preloaded task codes in order to reflect time
spent on clinic tasks or for "administration" time, i.e., time
spend on "'clerical' duties such as scheduling, writing notes,
or filing."  (Id. at ¶ 27.)  In addition, the "CareTrack" device
provided the time "clock" for payroll purposes.  (Miller Dep. at
27:11-13, 34:2-35:13.)  Consequently, Premier's physical
therapists, including Plaintiff, received "on-the-job training"
concerning the "CareTrack" device and the manner in which to
code various clinical and/or personal tasks.  (Willey Dep. at
146:20-147:6.)  Moreover, Premier specifically instructed
physical therapists to "clock[] in and clock[] out" when not
performing patient care, such as for time taken for lunch and/or
doctor's appointments.  (Miller Dep. at 28:3-23; see also Willey
Dep. at 166:10-14 (noting that "[i]t's common knowledge that
[physical therapists] clock out for lunch," when "leaving the
facility," attended "doctors' visits, physical therapy," and
"anything that is not clinic related").)  Despite the general
practice (see id), Plaintiff coded her physical therapy time as
"administration" time, but failed to perform any administrative
functions.  (Grant Dep. at 166:7-17.)  Nor did Plaintiff make
any specific inquiry into whether her physical therapy
constitute compensable time, or whether the "administration"
code in "CareTrack" qualified as the appropriate designation for
such time.  (Id. at 165:13-167:14.)

As a result of Plaintiff's improper recordation of her physical therapy time as compensable, administrative time, Ms. Miller issued Plaintiff a written warning dated January 13, 2009 for an array of performance and compliance issues.  (Speedy Cert., Ex. 24.)   The written warning specifically indicated that Plaintiff: failed to clock out for her therapy treatments for a total of 11 hours from December 26, 2008 through January 12, 2009; failed to communicate with Ms. Miller; and that Plaintiff failed to comply with the orthopaedist's orders for only modified duty by refusing to use her right upper extremity during the day. (Id.)   In addition, the written warning directed Plaintiff to "clock out for therapy time" and to complete an 8-hour day, and advised that any infraction in the next thirty (30) days might result in termination.  (Id.)

On the morning of January 16, 2009, Plaintiff met with Ms. Miller and Bruce Schaffer, one of Premier's Human Resources Officers, in order to discuss the "time deficit" associated with Plaintiff's miscoded physical therapy time.  (Defs.' SMF at ¶¶ 80-81.)  Ms. Miller specifically asked Plaintiff to "make-up" such time by working one and/or both of the following Saturdays, January 17, 2009 and January 24, 2009.  (Id.)  Plaintiff stated that religious obligations prevented her from working on January 17, 2009, but, despite several requests, provided no indication concerning her availability on January 24, 2009.  (Id.; Grant

13

Dep. at 176:13-177:7; Speedy Cert., Ex. 26.)  Nor did Plaintiff
return Ms. Miller's follow-up voicemail concerning Plaintiff's
schedule for January 24, 2009.  (Speedy Cert., Ex. 26; Grant
Dep. at 177:14-179:7.)  Rather, Plaintiff provided an untimely
response on January 19, 2009, after Ms. Miller finalized the
relevant work schedule.  (Speedy Cert., Ex. 25 (letter from
Plaintiff dated January 16, 2009); Grant Dep. at 178:1-5 (noting
that Plaintiff deposited the January 16, 2009 letter on January
19, 2009).)

In light of Plaintiff's behavior, including her
recalcitrance in scheduling, Defendants suspended Plaintiff on
January 19, 2009 for "Continued Insubordination" and "Poor
Communication."  (Speedy Cert., Ex. 26.)  On January 21, 2009,
Chelsea Chen-Gornick, Premier's Human Resources Director,
contacted Plaintiff in order to schedule an in-person meeting
concerning Plaintiff's suspension for January 22, 2009.  (Defs.'
SMF at ¶ 90; Pl.'s Br. at 3.)  Ms. Chen-Gornick then advised
Plaintiff, by separate voicemail message, "that she would be at
[Premier's] Linwood Center to meet her at 11:00 a.m. on January
22, 2009."  (Defs.' SMF at ¶ 91.)

Notwithstanding "multiple phone calls" and "voice
messages," Plaintiff failed to report to work on January 22,
2009.  (Id. at ¶ 91.)  Rather, at approximately 5:00 P.M. on
January 22, 2009, Plaintiff contacted Ms. Chen-Gornick

14

(McConnell Dep. at 100:5-101:8), and "informed her of everything that had gone on with regards to [her] suspension and [her] concerns leading up to [her] suspension." (Grant Dep. at 183:23-25.)  Ms. Chen-Gornick directed Plaintiff to provide a written statement delineating, with specificity, Plaintiff's account of the various discussions precipitating her suspension. (Id. at 184:5-7.)  Plaintiff, accordingly, filed a written response alleging that she received no information concerning the workers' compensation protocol prior to January 14, 2009, and that, subsequent to the reporting of her injury, she faced verbal abuse and constant direction, primarily from Ms. Miller, "to  perform outside of doctors['] orders and in opposition to [the] Physical Therapy practice act." (Speedy Cert., Ex. 27.)

As a result of Plaintiff's written response, Sarah Willey, Regional Director of Premier, Ms. Chen-Gornick, and Lisa McConnell, Regional Director of Human Resources for Premier, initiated an investigation into Plaintiff's allegations, and interviewed staff members supervised by Ms. Miller in order to inquire into Plaintiff's claims of verbal abuse, harassment, retaliation, and requests to work in excess of medical limitations and/or the Physical Therapy Practice Act. (Defs.' SMF at ¶ 96; Speedy Cert., Ex. 28.)  The investigation, consisting primarily of four (4) staff interviews, revealed: no employee witnessed verbal abuse, harassment, or retaliation from

15

any team member or management toward any Premier colleagues; and no instances in which Ms. Miller instructed colleagues to work against physician's orders or in contravention of the Physical Therapy Practice Act. (Speedy Cert., Exs. 28, 29, 30.) Indeed, the interview responses reflected that no staff member agreed with any of Plaintiff's allegations. (Id. at Ex. 30.) Defendants therefore concluded that Plaintiff's allegations required no further action. (See generally id.)

Rather, the investigation demonstrated that Plaintiff violated an array of company policies, including falsification of time-keeping records, insubordination, and failure to work in a cooperative manner. (Speedy Cert., Exs. 29-31.) On January 30, 2009, Ms. McConnell, Ms. Willey, and Ms. Chen-Gornick therefore decided to terminate Plaintiff's employment, and contacted Plaintiff in order to discuss Premier's decision. (Id. at Ex. 31.) Plaintiff returned the call on January 31, 2009, and agreed to meet at Premier's Linwood facility on February 4, 2009. (Id.) On February 4, 2009, Ms. Willey and Ms. Chen-Gornick met with Plaintiff, in person, and discussed the grounds for Plaintiff's termination. (Id.; see also Pl.'s Br. at 5.) Plaintiff thereafter left the facility, without incident. (Speedy Cert., Ex. 31.)

### C. Procedural History

Plaintiff filed a claim of discrimination with the Equal Employment Opportunity Commission (hereinafter, the "EEOC") on November 4, 2009. (See Compl.; Defs.' SMF at ¶ 3.)  In her EEOC charge, Plaintiff specifically alleged that Defendants violated the ADA by directing Plaintiff "to perform duties outside of [her] physical restrictions and professional duties in retaliation for filing a workers['] compensation claim." (Speedy Cert., Ex. 2.)

On March 23, 2012, Plaintiff received a "right to sue" letter from the EEOC, and thereafter filed suit in the Eastern District of Pennsylvania on June 15, 2012.  (See id.) Defendants moved to dismiss or, in the alternative, to transfer this action to this District, and the Eastern District of Pennsylvania transferred this action to this Court on August 20, 2012.  [Docket Items 2 & 7.]

This action therefore proceeded through pretrial factual discovery in this District, and the pending motions followed thereafter.

### D. Parties' Arguments

#### 1. Defendants' Motion for Summary Judgment

Defendants challenge Plaintiff's seven (7) claims on an array of jurisdictional, timeliness, and substantive grounds. (See generally Defs.' Br.)  Indeed, Defendants argue that all of

Plaintiff's claims are time-barred and/or fatally deficient,
except for Plaintiff's claims for ADA disability discrimination
and breach of contract.  (Defs.' Reply at 1.)  Defendants
assert, however, that Plaintiff's claim for breach of contract
lacks an essential predicate: any evidence of a contractual
arrangement between the parties.  (Defs.' Br. at 13-15.)
Indeed, Defendant asserts that the "clear and prominent
disclaimers in Plaintiff's offer letter, Employee Handbook, and
employment application, effectively preclude" the formation of
"any contract between the Parties."[9]  (Defs.' Reply at 3-4

---

[9] Defendants also challenge Plaintiff's assertion that the
Physical Therapist Practice Act, N.J.S.A. §§ 45:9-37.11-37.34f
(hereinafter, the "Practice Act"), provides Plaintiff an
alternative, contractual basis for relief.  (Defs.' Reply at 3.)
Defendants specifically assert that the Practice Act's
requirements constitute "merely a prerequisite to employment or
continued employment—not a contract."  (Id.)  The Court agrees,
and rejects Plaintiff's arguments to the contrary.  (See Pl.'s
Opp'n at 3-7.)  The Practice Act creates no contractual
obligation between physical therapists and their employers.
Rather, the Act prescribes the licensure requirements necessary
in order to become a licensed physical therapist, and sets forth
the continuing obligations and professional standards applicable
to such employment.  See, e.g., N.J.S.A. §§ 45:9-37.22 (setting
forth the requirements for licensure as a physical therapist),
45:9-37.34f (setting forth the continuing professional education
requirements).  In that regard, the Practice Act governs solely
the therapy professional's conduct, not the employers, and does
not provide the basis for a contractual claim between the
parties.  Moreover, even if the Practice Act constituted a
binding contractual arrangement, the undisputed records reflects
that Defendants considered the Practice Act in proposing various
accommodations to Plaintiff, and in response to Plaintiff's
assertions that certain requests contravened applicable
regulations.  (McConnell Dep. at 88:2-16.)

(citations omitted).)  Defendants, accordingly, argue that the
undisputed documents reflect that Plaintiff's employment
remained terminable at will.  (Defs.' Br. at 13-15; Defs.' Reply
at 3.)

Defendants therefore assert that Plaintiff's claim for
disability discrimination constitutes the "**only** claim" properly
before the Court.  (Id. at 2 (emphasis in original).)  With
respect to this claim, however, Defendants generally assert that
Plaintiff has failed to provide any record evidence to challenge
Defendants' "legitimate, business reasons for her termination."
(Defs.' Reply at 5.)  Indeed, Defendants argue that Plaintiff
has not, and cannot, point to any evidence to support her bare
assertions that "Defendants discriminated or harassed her on the
basis of disability" (Defs.' Br. at 6, 22), nor any deposition
testimony or written instructions to support Plaintiff's
allegations that Defendants directed Plaintiff to perform
unethical tasks.  (Defs.' Reply at 5.)  Defendants therefore
argue that Plaintiff's challenge to Defendants' "legitimate non-
discriminatory reasons for termination" rest solely upon
Plaintiff's patently insufficient disagreement with Defendants'
reasons, not upon credible record evidence.  (Id. at 7.)
Rather, Defendants assert that the undisputed record reflects
that Defendants' termination decision rested upon the well-
documented "behavioral issues" that pervaded Plaintiff's

approximately eight-month employment with Defendants. (Defs.'
Br. at 22-34; Defs.' Reply at 8.) Defendants, accordingly,
argue that no genuine issues of disputed fact preclude the entry
of judgment in their favor on all of Plaintiff's claims.
(Defs.' Br. at 34; Defs.' Reply at 9.)

Plaintiff's opposition challenges Defendants' motion only
in two narrow respects, namely, on the grounds that her
termination violated public policy, and occurred in retaliation
for Plaintiff's filing of a workers' compensation claim. (See
generally Pl.'s Opp'n.) Indeed, Plaintiff in essence concedes
that she declined to follow her supervisor's various directives.
(Pl.'s Opp'n at 3-5.) Plaintiff asserts, however, that such
instructions contravened the professional regulations that
governed Plaintiff's conduct. (Id.) Plaintiff therefore
contends her termination, which Defendants purportedly
predicated upon such compliance, violates her profession's
public policy laws and regulations. (Id.) In addition,
Plaintiff asserts that Defendants' purported basis for her
termination constitutes a mere contrivance and an effort to mask
Defendants' "egregious violation" of the ADA, particularly
because Plaintiff's pre-injury performance evaluations
purportedly depict Plaintiff as a model employee. (Id. at 5.)
Rather, Plaintiff nebulously asserts that "defendant's
testimony" and an unproduced "audio recording" of Ms. Miller

indicate that her termination occurred in retaliation for "reporting wrong doing" and for filing a workers' compensation claim.  (Id. at 5-6.)

### 2. Plaintiff's Motion for Summary Judgment

Relatedly, in support of her own motion for summary judgment, Plaintiff generally argues that the undisputed record reflect that Defendants "compromise[d] her recovery" by directing Plaintiff to perform "outside of" Plaintiff's functional abilities and physicians' orders, and denied Plaintiff "guidance on the facilities['] protocol and policies" for workers' compensation.  (Pl.'s Br. at. 1-3.) In that regard, Plaintiff asserts that Defendants' own conduct placed Plaintiff "in a position to be falsely accused of falsifying records and insubordination," thereby indicating that Plaintiff "should not have been terminated."  (Id. at 4.)  In addition, Plaintiff argues that her "swift termination" following Plaintiff's complaint with the "Workplace hotline" demonstrates that Plaintiff's termination occurred in retaliation for such filing, therefore entitling Plaintiff to summary judgment on her ADA claim.[10]  Id. at 5.)

---

[10] Plaintiff also argues that Defendants failed to produce handwritten weekly time sheets completed by Plaintiff, and urges the entry of summary judgment on that basis.  (Pl.'s Br. at 6-8.)  Defendants concede that Premier destroyed such documents, but assert that there exists no basis for the imposition of sanctions, because Plaintiff possessed copies of the weekly time

In opposition, Defendants generally argue that Plaintiff's motion highlights the absence of evidence supportive of Plaintiff's claims.  (Defs.' Opp'n at 2.)  Rather, Defendants argue that Plaintiff's "'proofs' in support of summary judgment" amount to little more than "unsupported allegations and a subjective perception that her injury resulted in termination." (Id. at 6.)

---

sheets prior to her demand that Defendants produce such documents, and because the weekly time sheets "were irrelevant to any decision-making regarding Plaintiff's miscoding of 'worked' time." (Defs.' Opp'n at 10, 12.) Rather, the "CareTrack" system's "daily time logs" provided the mechanism "to confirm employee work performance, prepare payroll, and create treatment billing records." (Id. at 10.) As an initial matter, the Court notes that this appears to be the first instance in which Plaintiff challenges the production of her weekly time sheets. Indeed, despite numerous conferences following Plaintiff's receipt of Defendants' certification concerning her weekly time sheets, Plaintiff failed to raise this discovery issue with Judge Williams, the U.S. Magistrate Judge assigned to handle the parties' discovery disputes. This issue should have been raised in the first instance before Judge Williams, and Plaintiff's failure to so raise warrants, by itself, the denial of Plaintiff's request. The Court, however, finds denial of Plaintiff's request warranted for additional reasons. Specifically, in seeking discovery sanctions based upon Defendants' destruction of certain documents, Plaintiff does not dispute, and indeed entirely ignores, that she retained possession of the disputed documents. In addition, the weekly time sheets lack relevance to the issues implicated in this action, because the record contains no dispute that Defendants relied exclusively upon the "CareTrack" system's daily time logs for all time-keeping purposes. (Miller Dep. at 27:11-13, 34:2-35:13.) For all of these reasons, Plaintiff's untimely request for the imposition of discovery sanctions will be denied.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) generally provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" such that the movant is "entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A "genuine" dispute of "material" fact exists where a reasonable jury's review of the evidence could result in "a verdict for the non-moving party" or where such fact might otherwise affect the disposition of the litigation. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts, however, fail to preclude the entry of summary judgment. Id.  In evaluating a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party, and must provide that party the benefit of all reasonable inferences. Scott v. Harris, 550 U.S. 372, 378 (2007); Halsey v. Pfeiffer, 750 F.3d 273, 287 (3d Cir. 2014).  However, any such inferences "must flow directly from admissible evidence[,]" because "'an inference based upon [] speculation or conjecture does not create a material factual dispute sufficient to defeat summary judgment.'"  Halsey, 750 F.3d at 287 (quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n. 12 (3d Cir. 1990); citing Anderson, 477 U.S. at 255).

Moreover, "[t]he standard by which the court decides a summary judgment motion does not change when the parties file cross-motions." United States v. Kramer, 644 F. Supp. 2d 479, 488 (D.N.J. 2008). Consequently, the Court's evaluation of the pending motions remains unaltered: "the court must consider the motions independently and view the evidence on each motion in the light most favorable to the party opposing the motion." Id. (citation omitted).

## IV.  DISCUSSION

As stated above, Plaintiff's Complaint contains a bevy of claims resulting from Plaintiff's brief, eight (8) month employment with Premier.  For the reasons that follow, the Court finds Defendants entitled to the entry of judgment on all claims.

### A. Plaintiff Failed to Exhaust Her Religious Accommodation Claims

Prior to initiating suit, a plaintiff alleging discrimination under Title VII or the ADA must first exhaust administrative remedies by timely submitting a charge of discrimination with the EEOC.  Mandel v. M & Q Packaging Corp., 706 F.3d 157, 163 (3d Cir. 2013); Williams v. E. Orange Cmty. Charter Sch., 396 F. App'x 895, 897 (3d Cir. 2010) (noting that exhaustion requirement applies to ADA claims).  The plaintiff's EEOC charge, in turns, puts "the EEOC on notice of the

plaintiff's claims and afford[s] it the opportunity to settle disputes through conference, conciliation, and persuasion," thereby avoiding unnecessary litigation.  Webb v. City of Phila., 562 F.3d 256, 262 (3d Cir. 2009).  In addition, the charge circumscribes the scope of the resultant litigation, by limiting such suit to only those allegations "within the scope of the prior EEOC complaint," or within a "reasonable investigation arising therefrom."  Antol v. Perry, 82 F.3d 1291, 1395 (3d Cir. 1996); Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir. 1984).  Although courts liberally construe the scope of the original charge, the charge must, at a minimum, be sufficient to put the EEOC on notice of the nature of the plaintiff's claims. Hicks v. ABT Assocs. Inc., 572 F.2d 960, 965 (3d Cir. 1978).

Here, the Court need not belabor Plaintiff's religious accommodation claim, because Plaintiff's EEOC charge, even liberally construed, contains no reference to any discrimination based upon Plaintiff's religion.  (Speedy Cert., Ex. 2.) Indeed, Title VII provides the exclusive basis for religious accommodation claims.  See Shelton v. Univ of Medicine & Dentistr of N.J., 223 F.3d 220, 224 (3d Cir. 2000) ("Title VII of the 1964 Civil Rights Act requires employers to make reasonable accommodations for their employees' religious beliefs and practices[.]") (citing 42 U.S.C. §§ 2000e2(a)(1), 2000e(j)). Plaintiff's EEOC charge and the notice subsequently provided to

Defendants, however, solely identified the ADA as the statutory predicate for Plaintiff's claim of discrimination. (Id.) Consequently, Plaintiff's religious claim falls well beyond the confines of her EEOC charge. See Antol, 82 F.3d at 1395.

Nor could investigation into Plaintiff's religious accommodation claim reasonably be expected from the EEOC's review of Plaintiff's "disability" and "retaliation" claims, particularly because such claim hinges, exclusively, upon Defendants' request that Plaintiff work a Saturday shift on January 17, 2009. (Id.) Plaintiff's EEOC charge, by contrast, nowhere references Plaintiff's work schedule as a basis for her allegations of discrimination. (Id.) Rather, Plaintiff relies solely upon the alleged direction "to perform duties outside of [her] physical restrictions and professional duties[.]" (Id.)

For all of these reasons, Plaintiff's religious accommodation claim will be dismissed for failure to exhaust administrative remedies.[11] Moreover, because the time for such

---

[11] Moreover, even if the Court found such claim within the ambit of Plaintiff's EEOC charge, the undisputed record reflects that Plaintiff's request for time off on January 17, 2009 rested upon her personal preference to participate in an ancillary church function, not upon a religious practice or obligation. (Grant Dep. at 174:16-175:24 (noting that Plaintiff's request for January 17, 2009 off rested upon her desire to attend a church business meeting).) Plaintiff's request therefore required no accommodation. See EEOC v. Union Independiente de la Autoridad de Acueductos, 279 F.3d 49, 56 (1st Cir. 2002) ("Title VII does not mandate an employer or labor organization to accommodate what amounts to a 'purely personal preference.'") (citation

exhaustion has long since expired, Plaintiff's religious accommodation claim will be dismissed with prejudice.  <u>See</u> 42 U.S.C. § 2000e-5(e)(1) (providing, in relevant part, that a claim of discrimination must be filed within three hundred (300) days after the allegedly unlawful employment practice occurred); <u>Amtrak v. Morgan</u>, 536 U.S. 101, 108-09 (2002) (noting that, a "claim is time barred if it is not filed within [this] time limit").

**B. Plaintiff cannot establish a prima facie case for breach of contract**

In her Complaint, Plaintiff alleges that Defendants breached their obligations under the parties' employment "agreement," despite Plaintiff's proper performance of all applicable terms.  (<u>See</u> Compl. at ¶¶ 62-64.)  Defendants, however, challenge the existence of any predicate agreement between the parties, arguing instead that Plaintiff relies upon documents that effectively disclaim the existence of any implied contract.  (Defs.' Br. at 13-15.)

Under New Jersey law, a claim for breach of contract requires: "(1) the existence of a valid contract between the parties; (2) failure of the defendant to perform its obligations

---

omitted); <u>Shelton</u>, 223 F.3d at 224 (noting that employers need only accommodate "employees' religious beliefs and practices"). Nevertheless, Defendants did indeed accommodate Plaintiff by requesting that she provide an alternative make-up work day. (Speedy Cert., Ex. 25.)

under the contract; and (3) a causal relationship between the breach and the plaintiff's alleged damages." See Sheet Metal Works Int'l Ass'n Local Union No. 27, AFL–CIO v. E.P. Donnelly, Inc., 737 F.3d 879, 900 (3d Cir. 2013).

With respect to the first element, an employment manual can, under limited circumstances, give rise to an implied contract of employment, absent a "'clear and prominent'" disclaimer. Nicosia v. Wakefern Food Corp., 643 A.2d 554, 557 (N.J. 1994). "An employer can make such a disclaimer by 'the inclusion in a very prominent position of an appropriate statement'" that the manual creates "no promise" of any kind by the employer; that the employer remains, despite the manual's terms, free to change all terms and conditions of employment, without notice; and that the employer retains "the absolute power" to fire with or without cause. Id. at 560 (citation omitted). In other words, an effective disclaimer "'must indicate, in straightforward terms, that the employee is subject to discharge at will.'" Id. (citation omitted).

Here, Plaintiff has produced no evidence from which a reasonable juror could conclude that a contract governed the parties' employment relationship. Indeed, in accepting Defendants' offer of employment, Plaintiff acknowledged the at will nature of her employment on three separate occasions (Speedy Cert., Exs. 4, 5, 9), in addition to her understanding

28

that the Colleague Handbook constitutes "neither a contract of employment nor a legal document." (Id. at Ex. 9.)  The Colleague Handbook further disclaims, on the first page following the Table of Contents, any construction of its terms as creating "contractual obligations of any kind or a contract of employment between Premier and any of its colleagues." (Id. at Ex. 8.)  Indeed, the Colleague Handbook expressly directs that Premier "may terminate the employment relationship at will, any time, with or without notice or cause," and provides Premier with the right to "revise, supplement, rescind or cancel any policies or portions of the handbook as necessary and appropriate, at its sole and absolute discretion[.]" (Id.)

In that regard, the Colleague Handbook disclaims, in sufficiently prominent and crystalline language, any suggestion that such document created any implied contractual arrangement. See Michaels v. BJ'S Wholesale Club, Inc., 2014 WL 2805098, at *15-*16 (D.N.J. June 19, 2014) (finding a handbook disclaimer effective where it stated the at-will nature of the employment, and sufficiently emphasized such provision in the initial pages of the document); Warner v. Fed. Express Corp., 174 F. Supp. 2d 215, 226-27 (D.N.J. 2001) (finding an employment handbook that stated that "[t]hese benefits and policies in no way constitute an employment contract" sufficiently clear for an employee to know that the handbook did not provide any contractual rights).

29

Nor does Plaintiff's deposition testimony create the inference of any contrary interpretation.  Rather, it serves only to substantiate Plaintiff's review and receipt of such documents.  (See Grant Dep. at 66:1-69:1.)  And, Plaintiff has produced no evidence, nor demonstrated a genuine issue of material fact concerning her construction and/or interpretation of such documents.  Nor has Plaintiff disputed the language or placement of the disclaimer.  See Warner, 174 F. Supp. 2d at 228 (""When the language and placement of a disclaimer is not disputed, as in this case, the sufficiency of the disclaimer can be decided as a matter of law.") (citations omitted).  Consequently, there being an effective disclaimer, the Colleague Handbook fails to set forth an implied contractual obligation.  Plaintiff's claim for breach of contract, Count I of her Complaint, will therefore be dismissed.

**C. Plaintiff cannot establish a prima facie case of fraud**

In support of Plaintiff's fraud claim, she proffers that: (1) Defendants terminated her under false allegations; and (2) that Defendants used malicious means to defame her good name and threaten her professional license and well-being.  (See Compl. at ¶¶ 74-79.)  Defendants, however, challenge Plaintiff's claim on particularity grounds, and argue that Plaintiff's claim must be dismissed for failure to plead such claim with the necessary specificity.  (Defs.' Br. at 18-19.)

Under New Jersey law, a claim for fraud requires Plaintiff to produce evidence of "(1) a material misrepresentation of fact; (2) knowledge or belief by the defendant of its falsity; (3) intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damage." Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007) (citing Gennari v. Weichert Co. Realtors, 691 A.2d 350 (N.J. 1997)). In addition, Plaintiff must meet the "stringent pleading restrictions of Rule 9(b), Fed.R.Civ.P." Id. Rule 9(b) provides, in relevant part, that "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." FED. R. CIV. P. 9(b). Consequently, in order to satisfy Rule 9(b)'s particularity requirement, "the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Frederico, 507 F.3d at 200.

Here, Plaintiff's fraud claim rests upon no such specificity. Indeed, Plaintiff, in essence, proffers no factual support for her fraud claim, much less the surrounding circumstances necessary to state a prima face fraud claim. Nor has Plaintiff produced any evidence in support of her assertions. Rather, Plaintiff relies upon nebulous, unsupported allegations of wrong of the variety routinely found insufficient

to support a viable fraud claim.  See, e.g., Angers v. Pennymac Loan Servs., LLC, 2014 WL 6668001, at *3 (D.N.J. Nov. 24, 2014) (noting that Plaintiff's bar allegations, lacking any particularity, are "'precisely the type of naked assertions devoice of further factual enhancement'" that fail to establish a fraud claim) (citation omitted).  Plaintiff's fraud claim, Count III of her Complaint, will, accordingly, be dismissed.[12]

### D. Plaintiff cannot establish a prima facie case of discrimination under the ADA

Broadly speaking, the ADA bars an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).  A prima facie case of discrimination under the ADA requires the plaintiff to demonstrate: (1) that the plaintiff possessed a qualifying disability under the ADA; (2) that the plaintiff otherwise possessed the qualifications necessary to perform the essential functions of the job, with or without reasonable accommodations by the employer;[13] and (3) that the plaintiff suffered an adverse

---

[12] Moreover, to the extent Plaintiff's claim, expressly identified as a "Fraud" claim, could be construed as one for defamation, for retaliation under New Jersey's "'whistleblower law,'" and/or for common law wrongful termination, the Court finds, as argued by Defendants, that any such claims would be untimely and precluded by the applicable limitations periods. (See Defs.' Br. at 19-21 (liberally construing Plaintiff's fraud claim and citing, with specificity, the applicable limitations periods).)

[13] Defendants do not dispute that Plaintiff's injury constituted a qualifying disability, nor that Plaintiff possessed the

employment decision as a result of discrimination.  Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1991) (quoting Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996))) (internal quotation marks omitted) (hereinafter, the "McDonnell Douglas framework").

Here, Plaintiff bring claims of disability discrimination and retaliation under the ADA.  (See generally Compl.) Specifically, Plaintiff contends that Defendants failed to reasonably accommodate her disability, unlawfully terminated her employment on the basis of her disability, subjected Plaintiff to a hostile work environment, and retaliated against her for filing a workers' compensation claim.  (See generally id.)  The Court will address each claim in turn.

### 1. No reasonable jury could conclude that Defendants failed to accommodate Plaintiff's disability

The ADA specifically provides that an employer "'discriminates' against a qualified individual with a disability when the employer" fails to "'mak[e] reasonable accommodations'" to the individual's known physical or mental

---

requisite qualifications for her position as a physical therapist.  Consequently, though the Court will presume satisfaction of these elements for the purposes of the pending motions, the Court notes, however, that Plaintiff has presented no evidence to demonstrate that she was disabled as defined under the ADA or that she had any disability that substantially limited any life activities.  See 42 U.S.C. § 12102(2).

limitations.  Williams v. Phila. Hous. Auth. Police Dep't, 380
F.3d 751 (3d Cir. 2004).  In order to survive summary judgment
on a failure to accommodate claim under the ADA, however,
Plaintiff must specifically point to evidence in the record
sufficient to establish that: (1) Plaintiff requested an
accommodation; (2) that Defendants failed to make a good faith
effort to assist in accommodating such disability; and (3) that
Plaintiff could have been reasonably accommodated.  Armstrong v.
Burdette Tomlin Mem. Hosp., 438 F.3d 240, 246 (3d Cir. 2006).
However, both employer and employee "have a duty to assist in
the search for [an] appropriate reasonable accommodation and to
act in good faith."  Williams, 380 F.3d at 771-72 (quoting
Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997)).

      In the standard, form portion of Plaintiff's Complaint,
Plaintiff alleges that Defendants failed to accommodate her
disability.[14]  (See Compl. at 3 on the docket.)  The addendum to
Plaintiff's Complaint, however, concedes that, following
Plaintiff's injury, she "returned to work on light duty
restrictions" and to a schedule adjusted in order "to

---

[14] The Court rejects Defendants' assertion that Plaintiff's claim
for failure to accommodate her disability should be dismissed on
exhaustion grounds.  (Defs.' Br. at 1.)  Rather, because the
Plaintiff's EEOC charge alleged that Premier directed Plaintiff
"to perform duties outside of" medical restrictions, the Court
finds investigation into Defendants' disability accommodation a
natural consequence of such charge.  (See Speedy Cert., Ex. 2.)
See Antol, 82 F.3d at 1395.

accommodate" her injury.  (Id. at ¶ 27.)  Plaintiff similarly

conceded during her deposition that Defendants did, in fact,

accommodate Plaintiff's disability, specifically providing

Plaintiff with a schedule that enabled her to work only with

those lower-need patients.  (Grant Dep. at 143:12-15, 251:11-

254:22 (acknowledged Defendants' accommodation, but challenging

the adequacy of "fullness" of such accommodation).)  Rather,

Plaintiff challenges the adequacy of such accommodation, in

light of her position, unsupported by doctors' notes, that

Plaintiff's injury rendered her arm "functionally lame" and

entirely inoperable.  (Id. at 209:11-210:3, 254:21-22.)

Consequently, even viewing these facts in the light most

favorable to Plaintiff, she has failed to show a lack of good

faith by Defendants.  Notably, although Defendants did not grant

Plaintiff the accommodation she requested (i.e., an exemption

from any work requirement), Defendants made a good-faith effort

to accommodate Plaintiff's disability.  Indeed, Plaintiff

concedes that Defendants made "doable" accommodations for

Plaintiff.  (Grant Dep. at 206:7-207:5 (noting that Defendants'

accommodations were "working" and that Defendants crafted a

"doable schedule" for Plaintiff).)  Rather, Plaintiff challenges

the reasonableness of Defendants' accommodations to the extent

Defendants declined to adopt Plaintiff's preferred

accommodation.  (Id. at 208:11-210:9.)  However, "[a]n employer

is not obligated to provide an employee the accommodation he
requests or prefers, the employer need only provide some
reasonable accommodation." <u>Yovtcheva v. City of Philadelphia
Water Dep't.</u>, 518 F. App'x 116, 122 (3d Cir. 2013) (quoting <u>Gile
v. United Airlines, Inc.</u>, 95 F.3d 492, 499 (7th Cir. 1996)).
Here, Defendants accommodated Plaintiff in accordance with
Plaintiff's physician-imposed limitations.  (Defs.' SMF at ¶
48.)  To the extent Plaintiff desired accommodation for
limitations in excess of those sets forth on Plaintiff's
undisputed medical documentation, the duty to submit such
additional documentation rested solely with Plaintiff.  <u>See
Taylor</u>, 185 F.3d at 317 (noting that "an employer cannot be
faulted if after conferring with the employee to find possible
accommodations, the employee [] fails to supply information that
the employer needs or does not answer the employer's request for
more detailed proposals").  Plaintiff, however, concedes that,
during the relevant period, her doctors directed only that
Plaintiff <u>limit</u> the use of her arm, and she has produced no
contemporaneous evidence, aside from her own supposition and
self-diagnosis, documenting any heightened limitations.[15]  (<u>See</u>
Grant Dep. at 230:3-231:18, 253:1-258:4.)  Consequently, there

---

[15] The subsequent determination in July 2009 that Plaintiff was
temporarily "not fit for work in her current condition" compels
no contrary result, because Plaintiff has produced no evidence
that Defendants received such information while she remained
their employee.  (Pl.'s Mot., Ex. 5.)

is no evidence from which a reasonable factfinder could conclude
that Defendants failed to accommodate Plaintiff.

## 2. No reasonable jury could conclude that Defendants unlawfully terminated Plaintiff

As with the failure-to-accommodate claim, the plaintiff
must first establish a prima facie case of discrimination under
the ADA in order to recover for an allegedly wrongful
termination. Taylor, 184 F.3d at 306.  In the event the
plaintiff succeeds in making out a prima facie case, a
presumption of discrimination arises, and "the burden of
production shifts to [the defendant] to offer evidence of a
legitimate, nondiscriminatory reason" for the adverse employment
action.  Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 271
(3d Cir. 2010) (internal quotation marks omitted) (citing
McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also
Shaner v. Synthes, 204 F.3d 494, 500 (3d Cir. 2000) (applying
the McDonnell Douglas framework to ADA claims).

Thereafter, the plaintiff must show, by a preponderance of
the evidence, that the defendant's proffered explanation
constitutes pretext for discrimination. Anderson, 621 F.3d at
271.  Specifically, a plaintiff must provide evidence "from
which a factfinder could reasonably either (1) disbelieve the
employer's articulated legitimate reasons; or (2) believe that
an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the employer's action."

Burton v. Teleflex Inc., 707 F.3d 417, 427 (3d Cir. 2013)

(citation omitted).

The plaintiff, however, must do more than simply show that the employer made a "wrong or mistaken" decision. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994); see also Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason."). Rather, evidence undermining an employer's proffered reason must be sufficient to "support an inference that the employer did not act for its stated reasons." Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995). At the summary judgment stage, such evidence must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation for its action, such that "a reasonable factfinder could rationally find them 'unworthy of credence.'" Burton, 707 F.3d at 427 (quoting Fuentes, 32 F.3d at 765).

Here, Plaintiff asserts that discriminatory animus produced the events leading to Plaintiff's termination. (See generally Pl.'s Br. at 1-4.) Defendants, however, argue that Plaintiff's discharge resulted from her insubordination, falsification of time-keeping records, and violations of Premier policy. (See Defs.' Br. at 22-29.) In order to meet her prima facie burden,

Plaintiff must demonstrate that her termination occurred because of her disability.  Williams, 380 F.3d at 761.  The record developed in this action, however, is replete with instances, pre- and post-injury, of Plaintiff's poor communications with her supervisor and general insubordination.  Indeed, in an evaluation concerning Plaintiff's performance prior to her injury, Ms. Miller noted that Plaintiff's performance only "partially meets requirements," in light of issues with respect to Plaintiff's attitude, productivity, consistent questioning of directives, and poor relations with coworkers.[16]  (Speedy Cert., Ex. 19.)  The evaluations subsequent to Plaintiff's injury similarly reflect that communicative and personality issues continued to pervade Plaintiff's post-injury service with Premier.[17]  (Id. at Exs. 20, 24.)  Plaintiff's inaccurate and

---

[16] Nor has Plaintiff produced any evidence to support her argument that Ms. Miller completed an evaluation in December 2008 solely as a result of Plaintiff's injury.  (See Pl.'s Opp'n at 1.)  Rather, Ms. Miller testified that the December 2008 evaluation occurred as a result of Ms. Miller's annual reviews "on everybody[,]" and Plaintiff challenges such assertion only with supposition, not any citation to record evidence.  (Miller Dep. at. 109:20-22.) Again, Plaintiff was treated no differently than other employees.

[17] The record does, however, cast doubt upon Plaintiff's substantive abilities.  Indeed, the record contains multiple references to Plaintiff's substantive competencies as a physical therapist.  (See, e.g., Speedy Cert., Ex. 19 (noting that Plaintiff "is a dependable and competent therapist); Miller Dep. at 203:7-18 (noting Plaintiff's diligence at her physical therapy duties).)  This fact alone, however, does not dictate that Plaintiff's termination resulted from her disability,

undisputed recordation of her physical therapy treatments as
compensable time therefore only served to amplify these
preexisting performance issues.  (Id. at Ex. 24.)  Plaintiff
attempts to contort these instances into acts of disability
discrimination, but relies upon conjecture and inaccurate
recitations or characterizations of deposition testimony, not
genuine record evidence.  (See, e.g., Pl.'s Supp. Br.)  This
showing, without more, fails to suffice.  See Chambers v.
Heidelberg USA, Inc., No. 04-583, 2006 WL 1281308, at *4 (D.N.J.
May 5, 2006) ("Speculations, generalities, and gut feelings,
however genuine, do not allow for an inference of discrimination
to be drawn when they are not supported by specific facts.").
The Court therefore concludes that Plaintiff has failed to
produce evidence in support of an essential aspect of her prima
facie burden, namely, that her termination occurred because of
her disability.

Moreover, even if the Court presumes that Plaintiff
established the elements of a prima facie case, in order to
survive summary judgment, Plaintiff must still produce evidence
demonstrating that Defendants' proffered justifications
constitute a mere pretext for discrimination.  Plaintiff,
however, has failed to sufficiently do so.  Notably, though

---

particularly because Plaintiff's attitude and communication
skills comprised the crux of Plaintiff's performance issues.

Plaintiff asserts that Defendants "contrived" and falsified their articulated grounds for her termination, Plaintiff produces no evidence in order to support such assertions. (<u>See</u> Pl.'s Opp'n at 5.)  Rather, Plaintiff's assertions amount, in essence, to challenges to Defendants' characterization of her actions and disagreements with the bases for her write-ups and ultimate termination.  (<u>See</u> Grant Dep. at 264:1-5 (arguing that Plaintiff should not have been terminate "under those bases").) Such contentions, however, suggest, at most, that Defendants' decisions were "wrong or mistaken," not that they derived from discriminatory animus.  <u>Fuentes</u>, 32 F.3d at 765.  Therefore, because Plaintiff has not pointed to any evidence that would allow a reasonable juror to find that Defendants' proffered reasons for its actions are a mere pretext for disability discrimination, Defendants is entitled to summary judgment on Plaintiff's wrongful termination claim.  See <u>Mercer v. S.E. Penn. Transit Auth.</u>, ___ F. Supp. 2d ___, No. 12-6929, 2014 WL 2767340, at *10 (E.D. Pa. June 18, 2014) (finding defendant entitled to summary judgment on plaintiff's wrongful termination claim, because plaintiff failed to establish the allegedly pretextual nature of defendant's proffered justification for termination).

>    **3. No reasonable jury could conclude that Defendants'
>       subjected Plaintiff to a hostile work environment
>       and/or disability-based harassment**

In order to establish a hostile work environment claim, the
plaintiff must show: (1) that the plaintiff suffered intentional
discrimination because of a disability; (2) that the
discrimination was "sufficiently severe or pervasive to alter
the conditions of [his] employment and create an abusive working
environment"; (3) that the discrimination detrimentally affected
plaintiff; and (4) that and the discrimination would have
detrimentally affected a reasonable person in his position.
Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d
Cir. 1999) (citation omitted).  "When deciding whether those
elements are established, courts must evaluate the record 'as a
whole,' concentrating 'not on individual incidents, but on the
overall scenario.'"  Mercer, ___ F. Supp. 2d ____, 2014 WL
2767340, at * 7 (quoting Cardenas v. Massey, 269 F.3d 251, 261
(3d Cir. 2001)).

The Court readily dispenses with Plaintiff's hostile work
environment claim, because Plaintiff's claim hinges,
exclusively, upon her assertion that Ms. Miller subjected her to
harassment, unnecessary actions, and constant interruption
during the work day.  (See Grant Dep. at 157:24-158:2, 252:12-
258:23.)  Despite Plaintiff's claims of constant harassment,
however, she points to no particular incidents of harassment,

42

relying instead upon generalized allegations.  Nor has Plaintiff presented any independent evidence tending to substantiate her claims that Ms. Miller acted in a harassing manner towards her, or towards any other Premier employee.  Indeed, the investigation conducted by Defendants reflects that no staff member agreed with any of Plaintiff's allegations.  (Speedy Cert., Exs. 28, 29, 30.)

Consequently Plaintiff presents, at most, aberrant and isolated incidents, bereft of detail, concerning being "badger[ed]" to work on certain days, being paged to the office, and being subject to "constant write-ups" for things Plaintiff professed an inability to do.  (Grant Dep. at 254:25-256:22.) However, even if Mr. Miller's conduct, accepted as true, "may have been offensive[,]" Plaintiff has made no showing that such behavior occurred because of Plaintiff's disability.  Walton, 168 F.3d at 667.

Moreover, even if Plaintiff provided the support necessary to attribute Ms. Miller's actions to Plaintiff's disability, Plaintiff has presented no evidence that the conditions became "sufficiently severe or pervasive" to create an abusive working environment to the reasonable person.  Id.  Rather, even with the benefit of the most favorable inferences, these isolated and undocumented incidents fail, without more, to establish a hostile work environment claim.  See Caver v. City of Trenton,

420 F.3d 243, 262 (3d Cir. 2005) (explaining that, unless extremely serious, offhand comments and isolated incidents are insufficient to sustain a hostile work environment claim).   In light of the lack of specificity and evidentiary support, no reasonable juror could conclude that Defendants subjected Plaintiff to a sufficiently severe and pervasive hostile working environment.   Defendants are, accordingly, entitled to summary judgment on Plaintiff's harassment claim under the ADA.

### 4. Plaintiff's ADA retaliation claim lacks any protected activity

The ADA generally provides that, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under the ADA.   42 U.S.C. § 12203(a).   Unlike a claim for discrimination, accommodation, or harassment, however, an ADA retaliation claim does not require that the plaintiff show a qualifying disability under the ADA.   See Shellenberger v. Summit Bancorp., Inc., 318 F.3d 183, 188 (3d Cir. 2003). Rather, in order to establish a prima facie case of retaliation, a plaintiff must show: (1) protected employee activity; (2) an adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) a causal

connection between the protected activity and the adverse

action.  Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005).

     In this action, Plaintiff argues that Defendants retaliated

against her for filing a workers' compensation claim.  The Court

of Appeals for the Third Circuit, however, recently concluded in

two separate unpublished Opinions that the filing of "a claim

for workers' compensation does not constitute protected

activity" under the federal discrimination statutes.  Lanza v.

Postmaster Gen. of U.S., 570 F. App'x 236, 241 (3d Cir. 2014)

(citing Reynolds v. Am. Nat'l Red Cross, 701 F.3d 143, 154 (4th

Cir. 2012) (finding that "[f]iling a workers' compensation claim

is not something that is covered by the ADA" and that

retaliation for making such a claim is not actionable under the

ADA); Davis v. Team Elec. Co., 520 F.3d 1080, 1093 n.8 (9th Cir.

2008) (finding that Title VII does not prohibit retaliation for

filing a workers' compensation claim)); Kendall v. Postmaster

Gen. of U.S., 543 F. App'x 141, 145 (3d Cir. 2013) (noting that

a workers' compensation claim cannot form the basis for a

Rehabilitation Act retaliation claim).  Moreover, the federal

district courts that have addressed this issue have reached the

same conclusion, namely, that filing a workers' compensation

claim fails to constitute a protected activity under the ADA.

See, e.g., Fieni v. Franciscan Care Ctr., No. 09-5587, 2011 WL

4543996, at *7 (E.D. Pa. Sept. 30, 2011) (collecting cases

rejecting the notion that filing a workers' compensation claim constitutes a protected activity under the ADA); <u>Leavitt v. SW & B Const. Co., LLC</u>, 766 F. Supp. 2d 263, 286 (D. Me. 2011) (same). Consequently, because Plaintiff has adduced no evidence in support of a legally cognizable retaliation claim under the ADA, such claims will be dismissed.

**V.   CONCLUSION**

For all of these reasons, Defendants' motion for summary judgment will be granted, Plaintiff's motion for summary judgment will be denied in its entirety. An accompanying Order will be entered.


**December 23, 2014**                     **s/Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          Chief U.S. District Judge